WEISS and another, Appellants, v. CHICAGO, NORTH SHORE & MILWAUKEE RAILROAD, Respondent.

*February 4—March 8, 1960.*

582

For the appellants there was a brief and oral argument by *Bernard N. Freudenfeld,* attorney, and *Harry A. Kovenock* of counsel, both of Milwaukee.

For the respondent there was a brief by *Wood, Brady, Tyrrell & Bruce* of Milwaukee, and oral argument by *Jackson M. Bruce.*

MARTIN, C. J. The only question on this appeal is whether the findings of the trial court warrant the judgment

and the orders appealed from. The following facts are taken from the findings of the court.

Since August 1, 1940, appellants have owned a 20-acre tract of land in Oak Creek, Milwaukee county. The land is bisected by a 100-foot-wide right of way of the respondent railroad which runs northwest and southeast across the land. Access to the land west of the right of way is had by means of a farm crossing at the south line of said tract. This crossing was constructed in 1910 pursuant to an agreement between the predecessors in interest of both appellants and respondent permitting the railroad to relocate a pre-existing farm crossing and requiring it to maintain it as relocated.

In 1940, 1943, 1946, and 1954 appellants acquired additional tracts of land. One of these, referred to as a triangular area consisting of 18½ acres west of respondent's right of way, is the area particularly involved in this action. Access to said triangular tract can be had from appellants' land east of the right of way only by means of the farm crossing referred to above.

Until 1956 appellants' lands on both sides of the right of way were used exclusively for farming and truck gardening, and the farm crossing was used by appellants for transporting farm machinery and implements to and from the land west of the right of way during the farming season, and for carrying loads of topsoil and marsh hay. Such crossings amounted to about 10 a week.

The land in the triangular piece was flat, low land with very wet soil frequently under water, and, despite cultivation each year since 1940 and the use of drainage-district facilities, this land produced only one good annual crop.

In 1955 appellants decided to drain the triangular tract, remove and sell the topsoil and establish a commercial dump with the object of ultimately filling it up and covering it with topsoil. For this purpose they went into partnership

with one John Sabo and excavated a drainage ditch on said land. In April of 1956 they obtained from the city of Oak Creek a license to operate a commercial dump facility in the area, and the license was renewed annually thereafter.

Operating under the name of Oak Creek Disposal, appellants solicit and obtain the business of truckers of commercial and industrial waste and for fees ranging from $4 to $18 per load, depending upon the nature of the waste, permit the dumping of such refuse in the dumpsite. This site is about one and one-half acres in area lying immediately west of the farm crossing; about one-half acre had been filled at the time of trial.

The trucks haul the waste material on a farm road on appellants' land, which is the only access to the dumpsite from the public road, over the farm crossing and thence to the dump. Between August, 1956, and March, 1957, the number of crossings by such trucks, operating over and back across the right of way, totaled from 84 to 310 per month. Appellants also salvage some of the waste material, hauling the same out by truck, and they also drive their own automobiles daily over the farm crossing to and from a small office at the dumpsite.

The dump is operated five days a week between the hours of 8 a. m. and 4 p. m. During this eight-hour period 16 of respondent's passenger trains pass the farm crossing. In addition, respondent operates a maintenance car about every other day, and daily a gasoline-powered scooter for observation of rails. Respondent also operates a freight train over the crossing once a week and from time to time operates extra unscheduled service.

Respondent's ordinary passenger cars weigh about 50 tons and carry 50 passengers per car. Its electroliner trains weigh in excess of 100 tons and carry about 150 passengers per car. The passenger trains operate at the farm crossing

at speeds of 70 to 75 miles per hour. To stop one of the single-car units traveling at 70 miles per hour takes about 2,200 feet under ideal conditions.

The farm crossing is constructed of planks placed parallel with the tracks between each set of tracks, and there is a plank on the outside of each track. Between the two sets of tracks there are two planks placed at right angles to the rails, and the remaining area is filled with stones and cinders. The tracks are elevated five or six feet above the surrounding farmland, and the approach from the east line of the right of way to the tracks is up a grade of about eight per cent. The corresponding grade from the west line of the right of way is about four per cent. About the time this action was commenced appellants erected at each side of the right of way on the south side of the roadway, signs with the cross and symbol "RR" about four or five feet above the ground.

There are on each side of the tracks and about 10 feet from the outer rails a line of poles about 100 feet apart carrying respondent's power-transmission lines, which interfere materially with the view up and down the tracks "depending on the position of the viewer in relation to the distance from the tracks." All of respondent's trains give a warning whistle for sixteen seconds when approaching a public road 1,900 feet from the farm crossing in question and in approaching another public crossing 2,500 feet away.

There have been no accidents at the farm crossing from August, 1956, through March, 1957, or prior thereto.

The trial court found that the use of the crossing for commercial dump trucks greatly increases the danger of accidents and the danger to employees and passengers on the trains, and greatly increases the hazard of danger to respondent's trains, right of way, and property far beyond

that necessary and incidental to its use for truck gardening prior to 1956.

It found that in view of the approaches and the construction of the crossing it is more hazardous to the users thereof and to the operation of the trains than a public highway crossing; that the crossing is unsafe for the use to which it is put by the commercial trucks; that the crossing as presently constructed is not suitable and convenient for such use; that the cost of maintaining a flagman or providing other safeguards at the crossing to permit a safer use in connection with the commercial dump operations would impose great expense and inconvenience upon the respondent and materially interfere with the operation of the railroad. It also found that the use of the crossing in connection with the dumping operations "involves such high maintenance expense, interference with the operation of the railroad, and increased hazards and dangers to the traveling public as to far exceed the benefits to plaintiffs resulting from their use of said farm crossing for nonagricultural purposes."

Since 1860 railroad corporations have been required by statute to maintain farm crossings for the use of those occupying lands adjoining the right of way. Sec. 192.33 (1), Stats., provides that railroad companies shall erect and maintain "suitable and convenient farm crossings for the use of the occupants of the lands adjoining."

There was a crossing over respondent's right of way for the benefit of the landowners prior to the execution of the grant of 1910 by the owners of the adjoining lands to respondent's predecessor consenting to a change in the location of the crossing. By said instrument the landowners released all right to the existing farm crossing upon condition that the railroad, before its discontinuance, should construct a farm crossing on the relocated site and agree to

"keep and maintain the same as a farm crossing across said right of way." Other than the use of the word "farm" as a designation of the crossing, there is nothing in the instrument restricting the use of the crossing to agricultural purposes.

In its conclusions of law the trial court first determined that the term "farm crossing," as used both in the statutes and in the 1910 grant, is not limited to the grant of a right in connection with the use of the adjoining land for agricultural purposes, but extends to and includes right of passage over the crossing for any purpose necessary in connection with the lawful use made of the adjoining land, including use as a licensed commercial dump; citing *Manitowoc C. P. Co. v. Manitowoc, G. B. & N. W. R. Co.* (1908), 135 Wis. 94, 115 N. W. 390.

The trial court held, however, that the operation of the commercial dump created such an increased danger and hazard to the respondent and to the traveling public as to require that appellants be prohibited from using the crossing for such operations, and that, "The use of the crossing should not be extended beyond its use for agriculture and farming uses because of the great danger to the safety of the traveling public."

The situation in the *Manitowoc Case, supra,* was different from that in the instant case in several respects. The railroad had acquired its right of way by condemnation, cutting through the land in a way which separated the plaintiff's brick factory from its source of clay and between which there had been an existing road. It was held that the plaintiff had the right to a crossing suitable for the use of the land and damages assessed with reference thereto. The question of public safety was not involved. It is undoubtedly true that in 1908 the type of vehicle using the crossing there in question was vastly different in char-

acter from the commercial trucks and tractor-trailers which use the crossing in this case in connection with the appellants' dump operations.

After appellants here filed their petition for review of the trial court's decision, the court carefully reconsidered the evidence and concluded:

"This court found that the present use of the farm crossing increased the hazard to the traveling public. On a review of the testimony the court is persuaded to believe that its findings as to the increase in hazard and danger involved in the present use of the farm crossing was worded conservatively. Despite a passing disagreement by plaintiffs' counsel with that finding, the court is convinced that the finding is abundantly supported by the great weight of the evidence. The facts speak for themselves."

The findings are not challenged on appeal. Appellants' principal argument is that the trial court had no power to limit the use of the farm crossing to agricultural purposes in view of the decision in the *Manitowoc Case, supra.* We have pointed out above some of the differences between that case and the instant one. Appellants maintain that so long as the crossing is used in connection with lawful commercial operations the court has no power to prohibit such use. We cannot agree. As pointed out by the respondent, under their theory appellants could erect a truck terminal or shopping center on their land west of the tracks and permit the public in unlimited numbers to cross the tracks on this farm crossing; and such use would be tantamount to converting the crossing into a public crossing.

Under sec. 195.29 (1), Stats., it is the duty of the public service commission, in connection with the establishment or alteration of public crossings, to determine whether such crossing will promote "public safety." See *Green Bay & W. R. Co. v. Public Service Comm.* (1955), 269 Wis. 178,

68 N. W. (2d) 828. In that case it was held that a definite finding of public safety by the commission is a condition precedent to issuance of an order authorizing a proposed public crossing.

There can be no doubt that public safety is involved in any substantial increase in the use of a farm crossing, as here indicated. Since the public service commission has no jurisdiction over a farm crossing, it must be held to be within the jurisdiction of a court of equity to determine whether or not the use of such a crossing in furtherance of a commercial use of the adjoining land is in the interest of public safety.

While the *Manitowoc Case, supra,* held that the word "farm" in the statute is only descriptive of the crossing and not of the adjoining lands, it was also pointed out that (p. 105):

". . . the only limitation upon the crossing is found in the words 'suitable and convenient' to be applied to its location, construction, and use as bearing upon the interests of the owner of the land and of the railroad company *and of the traveling public.*" (Emphasis supplied.)

A farm crossing is the simplest, or "lowest," form of railroad crossing. It is private in character, access to the same being through or upon private lands, and its purpose is only to accommodate the occupants of such lands. The statutes set out no standards for the establishment and maintenance of a farm crossing except that it be "suitable and convenient" for the use of the adjoining landowner. At such a crossing the railroad is not required to maintain warning signs or give warning whistles or slow the speed of its trains. In stating that a farm crossing shall be "suitable and convenient" the law does not contemplate any use of the crossing which would make such regulation necessary in the interest of public safety.

In *State ex rel. Jacquith v. Wisconsin Central R. Co.* (1905), 123 Wis. 551, 555, 102 N. W. 16, this court observed that the suitability and convenience of a farm crossing for use of occupants of the land is to be considered with due regard to the inconvenience and expense to the railroad company, the increase of the hazard of accidents, and that:

". . . a crossing, especially an additional one, which would only slightly enhance the convenience of the owner, but would seriously obstruct the operation of the railroad, or impose upon it very great expense, should perhaps be denied altogether under certain circumstances."

Certainly where there are findings, not only of great expense to the railroad and interference with its operation, but of great hazard and danger to the traveling public, we have circumstances where the use of a farm crossing for the purposes creating the unsafe condition can and should be "denied altogether."

Contrary to the contention of appellants, the decision of the trial court was not based merely on the equitable doctrine of the balance of conveniences. It held, as a matter of substantive law, that appellants are not entitled to the use of the crossing in connection with the commercial dump operations because such crossing is not "suitable and convenient" within the meaning of the statute. What distinguishes this case from the authorities cited by appellants is the overriding factor here of public safety.

It is not disputed that the crossing is unsafe in that its construction is not suitable to the volume and character of traffic passing over the tracks; that the number of crossings have increased from about 40 to 310 per month; that respondent operates its 16 passenger trains per day (during the hours of dump operations) at speeds of 70 to 75 miles per hour. The trial court stated that under such conditions no one could take issue with the respondent's assertion that

maintenance of a crossing watchman is necessary to keep the crossing safe. It emphasized that respondent is a common carrier on whom the law imposes the duty of operating its trains for the public interest and convenience, and the duty of exercising the highest degree of care for the safety of its passengers.

It is elementary that where the safety of the public is involved, the rights of the individual must yield. It is established that the safety of the traveling public is endangered by appellants' use of the crossing in connection with the dump operation. We hold that the judgment is supported by the findings.

*By the Court.*—Judgment and orders affirmed.

FAIRCHILD, J., dissents.