SIXMILE CREEK ASSOCIATES, INC., a Wisconsin corporation, and Robert R. Ranguette, Petitioners-Plaintiffs-Respondents,†

v.

CHICAGO & NORTH WESTERN TRANSPORTATION COMPANY, a Delaware corporation, Respondent-Defendant-Appellant.

Court of Appeals

No. 93-0127. Submitted on briefs June 4, 1993.—Decided July 1, 1993.

(Also reported in 504 N.W.2d 348.)

†Petition to review denied.

For the respondent-defendant-appellant the cause was submitted on the briefs of *Michael D. Stotler* and *Thomas L. Smallwood* of *Borgelt, Powell, Peterson & Frauen, S.C.,* of Milwaukee.

For the petitioners-plaintiffs-respondents the cause was submitted on the brief of *Don M. Millis* and *Kim Grimmer* of *Ross & Stevens, S.C.,* of Madison.

Before Eich, C.J., Gartzke, P.J., and Dykman, J.

EICH, C.J. The Chicago and North Western Transportation Company appeals from a judgment and absolute writ of mandamus ordering it to construct and maintain three at-grade "farm crossings" on its railroad right-of-way and track running through land on

which Sixmile Creek Associates, Inc., plans to construct a golf course.

The issue is whether, given the nature of the property and the intended use of the proposed crossings, they qualify as "farm crossings" within the meaning of sec. 192.33(1), Stats., which requires railroads to "erect and maintain . . . suitable and convenient farm crossings for the use of the occupants of [adjoining] lands . . . ." We hold that they do not and reverse the judgment.

Sixmile was incorporated for the purpose of developing a 428-lot residential subdivision near the Village of Waunakee in Dane County. Included in the project is a 155-acre golf course over which C&NW owns and operates a single-track railroad right-of-way. An average of two eighty- to one hundred-car trains operates over the track each day at a maximum speed of thirty miles per hour.

The proposed golf course will be open to the public, with a limited number of private memberships. During the three and one-half month "peak" golf season, approximately 200 persons will be playing the eighteen-hole course daily, with approximately 100 persons playing daily during an equally long "non-peak" season. In all, there will be over 85,000 crossings of the C&NW track by golfers each year, in addition to an unknown number of crossings by course maintenance employees.

When C&NW declined Sixmile's request that it construct the three crossings on the course, Sixmile brought this mandamus action under sec. 192.33(1), Stats., to compel it to do so. After taking evidence, the trial court concluded that the proposed crossings were "farm crossings" within the meaning of the statute and ordered the railroad to build them. Specifically, the court ordered C&NW to construct and maintain the

portions of the crossings within the railroad right-of-way and required Sixmile to build and maintain the approaches and to pay "[t]he entire cost of installation of the . . . crossings." The court also directed that Sixmile install a variety of warning signs and devices at the crossings and elsewhere along the track and adopt a series of rules warning golfers of the dangers of the crossings. The railroad appeals.

■

"Farm crossings" are distinguished from highway crossings both in their use and the extent of required crossing protections. *Manitowoc Clay Prod. Co. v. Manitowoc, G. B. & N.W. Ry..*, 135 Wis. 94, 101, 115 N.W. 390, 393 (1908). They are not limited to farm or agricultural use. Rather, "[t]he words 'farm crossings' are descriptive of the kinds of crossings required for the use of occupants of adjoining lands, as distinguished from highway crossings . . . and railroad crossings." *Id.* Thus, courts have ordered that farm crossings be established under the statute to enable owners whose lands are bisected by the railroad to operate a quarry,[1] a logging enterprise,[2] or, as in *Manitowoc*, a brickyard.

■

What primarily distinguishes a farm crossing from a highway crossing is the lesser degree of protection offered to its users, and the fact that the crossing exists "only to accommodate the occupants of [the adjoining land]." *Weiss v. Chicago, N. S. & M.R.R.*, 9 Wis. 2d 581, 590, 101 N.W.2d 688, 693 (1960).

---

[1] *Buffalo Stone & Cement Co. v. Delaware, L. & W. Ry.*, 29 N.E. 121 (N. Y. 1891).

[2] *Caldon v. Chicago, St. P., M. & O. Ry.*, 85 Wis. 527, 55 N.W. 955 (1893).

A farm crossing is the simplest, or "lowest," form of railroad crossing. It is private in character, access to the same being through or upon private lands, and its purpose is only to accommodate the occupants of such lands. The statutes set out no standards for the establishment and maintenance of a farm crossing except that it be "suitable and convenient" for the use of the adjoining landowner. At such a crossing the railroad is not required to maintain warning signs or give warning whistles or slow the speed of its trains. *In stating that a farm crossing shall be "suitable and convenient" the law does not contemplate any use of the crossing which would make such regulation necessary in the interest of public safety. Id.* (emphasis added).

A farm crossing under sec. 192.33(1), Stats., then, has two primary characteristics: it is private in nature and is the "lowest form" of crossing in that it is not intended to entail any use which would make warning signs or signals or train speed limits, or similar safety precautions, "necessary in the interest of public safety."

In this case the golf course will be open to the public and, as we have noted, will involve more than 85,000 crossings by golfers each year. The trial court concluded, nonetheless, that various "restrictions" proposed by Sixmile on the use of the course — guarding against trespassers, and adopting rules providing that all golfers must check in at the clubhouse before playing, where they will receive a written admonition to read and obey all signs located on the course and be required to sign a hold-harmless form — will ensure that the crossings will remain private and "not [be] convert[ed] . . . into . . . public crossing[s]." We disagree.

242

We do not believe such "restrictions" are adequate to render the crossings private in the face of Sixmile's acknowledgement that the course "will be a public golf course," and that "[a]nybody from the public can play . . . [a]s long as they pay the greens fee."

Nor do we consider the proposed crossings to be of such a nature as "not [to] require[ ] . . . warning signs" or similar safety devices. Indeed, the trial court itself felt the need to impose added safety requirements as a condition of its order, directing that Sixmile, among other things, (a) erect and maintain stop signs and crossbuck signs at each crossing, (b) paint stop lines on the pavement adjacent to each side of the track in the area of the crossings, (c) place additional warning signs directing golfers to stop and look both ways before entering the crossing and still more warning signs at 300-foot intervals along both sides of the track, (d) maintain a level grade for thirty feet on each side of each crossing and remove all trees and vegetation along the right-of-way in order to maintain a "sight distance" of 400 feet on either side of the crossing, and (e) implement the rules regarding advance golfer check-in, distribution of written warnings and execution of hold-harmless agreements, discussed above.[3]

---

[3] In an attempt to justify its argumentative assertion that we are "penalizing" Sixmile for its good works in supporting safety at the crossings, the dissenting judge criticizes as erroneous our reference to the trial court's "requirement" that warning signs and other safety measures be included in the crossings. The criticism ignores the plain language in the court's judgment that "Petitioners-Plaintiffs *shall incorporate and employ* all the precautions set forth on Exhibit No. 19 for so long as they use their property as a golf course . . . ." The exhibit was prepared by Sixmile, so it is true that they suggested the precautions. It is

As we have said, "farm crossings," as contemplated by sec. 192.33(1), Stats., are those entailing a limited private use for which such warnings and safeguards would be "[un]necessary in the interest of public safety." *Weiss*, 9 Wis. 2d at 590, 101 N.W.2d at 693. In this case, the trial court went to great lengths to emphasize its concern for considerations of safety at the proposed crossings and conditioned its order requiring their construction upon Sixmile's installation and implementation of a variety of signs, warnings and safety-related operations. If the crossings are of such a nature as to require these additional safeguards, they cannot be considered farm crossings within the meaning of the statute. We therefore reverse the judgment entered on December 17, 1992, and remand to the trial court with directions to grant C&NW's motion to quash the alternative writ and dismiss Sixmile's action.

*By the Court.*—Judgment reversed and cause remanded with directions.

DYKMAN, J. (*dissenting*). The trial court made a number of findings which supported its decision. These included the statistic that nationwide, accidents involving trains occur, on average, once every thirty-eight years at each railroad crossing. At least three other golf courses in Wisconsin have active railroad lines passing through them. No accident has occurred

---

also true, however, that the trial court, recognizing the need for safety devices at the crossings, did indeed "require" that they be installed as a condition of approving the crossings.

between a train and a golfer or a train and a golf cart.[1] The trial court placed great weight on this statistic. It then compared the proposed facility with the existing facilities, and concluded that the visibility on the proposed course would be at least as good as on the other courses. Train speeds on the other courses are higher. Taking all factors of the three existing courses and the proposed course into consideration, the court concluded that, with the precautions Sixmile proposed, the course would be less dangerous than any of the other three courses.

Section 192.33(1), Stats., requires only that a farm crossing be "suitable and convenient." The majority recognizes that the term "farm crossing" may properly have nothing to do with farms. The term refers only to a type of crossing with the least need for protection.

In *Weiss v. Chicago, N. S. & M.R.R.*, 9 Wis. 2d 581, 591, 101 N.W.2d 688, 693 (1960), the court recognized the significance of findings of fact made by the trial court. The court said:

> Certainly, where there are findings, not only of great expense to the railroad and interference with its operation, but of great hazard and danger to the traveling public, we have circumstances where the use of a farm crossing for the purposes creating the unsafe condition can and should be "denied altogether."

*Id.*

Expense, interference, hazard and danger are factors the trial court weighs against convenience and suitability of the crossing. The *Weiss* court noted that

---

[1] The trial court noted that there had been one minor incident in which a train struck an unattended pull cart at the La Crosse Country Club.

there are no standards for the establishment and maintenance of a farm crossing except suitability and convenience. *Id.* at 590, 101 N.W.2d at 693. One would search for a long time before finding another statute which gives as much discretion to the trial court.

The majority does not consider whether the trial court's findings of fact are clearly erroneous, nor whether the trial court improperly exercised its discretion when it balanced the railroad's interests against those of Sixmile. Its analysis is *de novo.* I think that this approach fails to consider the deference we give to trial courts' findings and discretionary rulings.

By analyzing this case as a "public-private" issue, the majority changes the *Weiss* directive that a trial court is to balance convenience against safety. That court said:

> Since the public service commission has no jurisdiction over a farm crossing, it must be held to be within the jurisdiction of a court of equity to determine whether or not the use of such a crossing in furtherance of a commercial use of the adjoining land is in the interest of public safety.

*Id.* at 590, 101 N.W.2d at 692.

The supreme court's analysis in *Weiss* makes common sense. Whether a crossing would be so unsafe that it should be prohibited is the only real question. The public or private nature of the crossing may be a factor in this analysis, but it ought not be dispositive. Were Sixmile to be organized as a private golf course, with memberships sufficient to create 85,000 crossings per year, the danger of pedestrian-train accidents would be the same.

The majority also reasons that if the trial court believed it necessary to require warning signs, the

246

crossings could not be farm crossings. The problem with this reasoning is that the trial court did not "require" the signs. The signs were included in an exhibit Sixmile introduced to show how it intended to build the crossings.

Sixmile contended that it was interested in safety on its golf course. The signs and methods of construction of the crossing were features Sixmile asked the trial court to consider when determining whether to grant Sixmile's petition. The trial court considered and accepted the proposed signs as it considered field of view, train speed, train frequency and the safety record of other golf course crossings. Had Sixmile omitted the warning signs from its presentation, its chances of success at trial might have diminished, but its chances as a respondent on appeal would have increased considerably. In future cases, applicants would be well advised to omit warning signs from their proposed crossings. I find this anomalous.

The majority is penalizing Sixmile because it took an interest in its patrons' safety and attempted to alleviate the railroad's concerns about the crossings. The majority requires a safety analysis to be made as the land now exists — a farm field — not as it would be used by the golf course. This does not make sense to me, and it is unfair to Sixmile.

The trial court made findings of fact which cover fourteen pages of transcript. These findings cover every aspect of the need for the crossings by Sixmile and the detriment to the railroad of having those crossings. The court considered alternative ways of constructing the course. It did an extensive cost-benefit analysis, with an emphasis on safety. It recognized that absolute safety was impossible to achieve. It considered the cost of tunnels or overhead crossings. It

noted the low use of the tracks, the slow speed of the trains, the high visibility of approaching trains, and the excellent safety record at other golf course farm crossings. It found that detriment to the railroad was *de minimis*. The trial court's balancing of the parties' interests and its conclusions of law cover nine more pages of transcript.

Were I writing for the majority, I would conclude that the trial court's findings of fact were not clearly erroneous, and that it did not erroneously exercise its discretion. I would do so because appellate courts traditionally defer to trial courts in these areas. Having accepted the trial court's findings and exercise of discretion, it would be nearly impossible to reject its conclusion that the farm crossings are suitable and convenient. Thus, were I writing for the majority, I would affirm.