**COURT OF APPEALS
DECISION
DATED AND FILED**

**March 31, 2026**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing.  If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.  *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP2222**

STATE OF WISCONSIN

Cir. Ct. No. **2024CV281**

IN COURT OF APPEALS
DISTRICT I

CITY OF MIDDLETON,

PETITIONER-RESPONDENT,

V.

THE OFFICE OF COMMISSIONER OF RAILROADS,

RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Dane County: RHONDA L. LANFORD, Judge.  *Reversed.*

Before White, C.J., Colón, P.J., and Geenen, J.

¶1      GEENEN, J.   The State of Wisconsin's Office of Commissioner of Railroads ("OCR") appeals the circuit court's order concluding that the Aurora Street pedestrian railroad crossing in downtown Middleton is a "public" crossing

under WIS. STAT. §§ 195.28 and 195.29 (2023-24).[1]  The circuit court's order reversed OCR's administrative determination that the crossing is private.  The parties do not dispute that OCR can only regulate public railroad crossings under §§ 195.28 and 195.29, but they disagree on the status of the Aurora Street pedestrian railroad crossing. Thus, the issue on appeal is whether the pedestrian crossing is public.  Whether the crossing is public largely depends on whether the privately-owned pedestrian footpaths (sometimes referred to as "approaches") from both sides of the crossing are "public ways."

¶2      The City of Middleton (the "City") contends that the footpaths are a public "highway," and therefore, the crossing is public by operation of a public access easement it claims to have obtained when it sold the land on which the footpaths rest to private developers in the 1980s.  The City also asserts that the crossing is public due to actions taken involving the City's zoning powers and because the crossing was "dedicated" as a public crossing.  OCR maintains that the crossing is private because the public access easement contains restrictions on public use of the crossing and includes language allowing the private owners of the footpaths to revoke the easement at any time.  OCR argues that the restrictions and conditions memorialized in the easement prevent the crossing from being public.

¶3      There is no dispute that the crossing was public when the City owned the footpaths to the crossing.  However, the City fails to establish that the footpaths remained public after it sold the land on which the footpaths lay to private parties.  We agree with OCR that the easement's discretionary and

---

[1]  All references to the Wisconsin Statutes are to the 2023-24 version.

unilateral termination language make the easement too indefinite for the footpaths to be considered a public way. Accordingly, we agree with OCR and reverse the circuit court's order.

## BACKGROUND

¶4 For many years, a railroad crossing at Aurora Street in downtown Middleton facilitated vehicular and pedestrian traffic across the railroad tracks. In 1981, the City sought to redevelop land in its downtown area for a commercial center. As a part of the plan, the portions of Aurora Street on either side of the railroad tracks were closed to vehicle traffic between Hubbard Avenue and Terrace Avenue. To promote access to the businesses, restaurants, and shops that might become located in this area, the plan contemplated maintaining a pedestrian footpath at the Aurora Street crossing despite the street closure. The plan also called for creating a new public crossing for both vehicles and pedestrians about one block away, where the tracks crossed Verona Street. The City petitioned OCR for approval of the new crossing and the changes at the Aurora Street crossing under WIS. STAT. §§ 195.28 and 195.29, and OCR approved the City's plan.

¶5 When the City owned all of the property being developed, the City recorded its 1982 general development plan with the Dane County Register of Deeds. That plan, which was subject to annual review pursuant to its own terms, referenced a "permitted pedestrian crossing" and "pedestrian access" in the vicinity of the Aurora Street railroad crossing, specifically providing that a "permitted pedestrian crossing and utility easement within the Aurora Street [right-of-way] will be retained by the City," and that the "Aurora Street [right-of-way] will be reduced to a 20' easement and converted to pedestrian access and railroad crossing to connect the parking area south of the railroad tracks with the

commercial buildings." Finally, it noted that "[t]here will be no public street circulation within the rezoned property." While a 20-foot-wide utility easement was recorded separately from the plan, a separate pedestrian access easement was not, nor was any further explanation or description of the proposed pedestrian easement given. The area that purportedly designated a pedestrian easement extended between the parking lot and a building, not to the public streets. The pedestrian access system and internal public spaces were to be refined at the implementation phase of development.

¶6 The City subsequently sold the land on either side of the railroad crossing, including the land within the Aurora Street right-of-way, to private developers. The record contains no evidence of deed restrictions related to the preservation of public pedestrian access to the railroad crossing attached to the properties' sales.

¶7 Following the land sales, the City's 1987 implementation plan continued to claim a 20-foot easement with pedestrian access on either side of the railroad crossing. That same year, in collaboration with the then-rail operator, the City used public funds to construct pathways within the Aurora Street right-of-way on both sides of the railroad crossing. No additional public maintenance or improvements were performed between 1987 and 2020.

¶8 Subsequent site and development plans for which the successor owners of the property sought approval show the sites being designed with pathways that provide access to the crossing from the public streets to the north and south.

¶9      Pedestrians used the crossing from the 1980s through 2021, and the employees of businesses within the development used the crossing to get from parking lots located on one side of the tracks to their workplace on the other.

¶10     In 2020, the current railroad operator, Wisconsin & Southern Railroad, LLC ("Railroad"), contacted OCR and asked for a determination of whether the crossing was public or private. The Railroad explained that the land on either side of the crossing was privately owned and that there was no known easement to the City allowing public access to the crossing. On this information, OCR determined that the Aurora Street crossing "was converted from public to private by operation of law when Middleton sold the property [portions of the former Aurora Street on either side of the crossing] to a private developer." Following this determination, OCR advised state agencies that it no longer had jurisdiction to order any improvements or upgrades to the crossing.

¶11     The City was not notified of the Railroad's request or OCR's determination, and the City did not have the opportunity to present evidence that the crossing was public before OCR made its decision. Several months later, when the City learned of OCR's determination that the crossing was no longer public, the City sought to reverse the decision and asked OCR to conduct a new hearing on the crossing's status. Also in response to learning of the determination, in late 2020, the City entered into an Access Easement Agreement with the owners of the properties on both sides of the crossing on which the footpaths across the

railroad tracks lie ("Owners"), which was amended the following year (as amended, "the Easement").[2]

¶12    The Easement provides for a ten-foot wide "permanent easement and right-of-way to the public for pedestrian passage/access" to and across the railroad tracks through the former Aurora Street right-of-way. The Easement is permanent and runs with the land. It "may not be modified, amended or terminated" except by written agreement between the City and the Owners. It may, however, be terminated unilaterally by the Owners if, "in the Owner's sole discretion," the public's use of the Easement "becomes a nuisance due to abuse by the public."

¶13    The Easement contains several restrictions on public access. It bars public access between 11:00 p.m. and 4:00 a.m. "to deter undesirable activities," prohibits loitering and camping on the footpaths, or other uses that would inhibit the Owners' (and their tenants' and residents') private enjoyment of the Owners' property. It also permits the Owners, with the City's consent, to close the footpaths for emergencies or safety concerns or to temporarily close the footpaths for outdoor restaurant seating provided the Owner offers the public an alternate route to the crossing. The Easement further provides that, with respect to any use of the Easement, neither the City nor the Owners will unreasonably interfere with its use by the general public.

¶14    Under the Easement, the City assumes liability and holds the Owners harmless for any loss, damage, injury, or liability resulting from negligence on the

---

[2] We do not discuss the original Access Easement Agreement further because the Easement was the document that granted public access for the purposes of review in the relevant, subsequent OCR and circuit court review hearings.

part of the City and its agents or members of the public in connection with the use of the footpaths. The City is also responsible for maintaining the order and physical condition of the paths, which requires reconstructing, operating, repairing, replacing, or supplementing the paths as necessary. Snow removal, however, is left to the City's discretion.

¶15 When OCR did not act to conduct a new hearing on the crossing's public/private status, the City filed two petitions for judicial review of OCR's determination that the crossing had become private. One petition alleged procedural deficiencies related to OCR making a determination without notice or a hearing. The second petition challenged OCR's determination on the merits. The cases were consolidated.

¶16 Following hearings and briefing, the circuit court reversed OCR's determination on procedural grounds, concluding that "OCR did not follow proper procedures under WIS. STAT. § 195.29(1) before reclassifying the Aurora St[reet] crossing" as private because a fact-finding hearing was required.

¶17 In accordance with the circuit court's order, OCR held a public fact-finding hearing on whether the crossing was public or private. The City presented testimony by three witnesses, in addition to other evidence. Ultimately, the City argued that the pedestrian footpaths were public because of the Easement the landowners granted to the City. The City also contended that the crossing was public due to its zoning powers and in accordance with its various redevelopment plans since the 1980s, and it argued that the crossing had been "dedicated" as a public crossing.

¶18 In its decision following the hearing, OCR found that the Aurora Street pedestrian railroad crossing facilitated pedestrian access across railroad

tracks that divide Middleton Center and its shops, restaurants, and businesses for nearly 40 years, but that the City sold the land located on either side of the crossing to the Owners long ago, and the footpaths were therefore privately owned. Relying on these facts and a variety of state and federal regulations and guidance, including 49 C.F.R. § 234.401, which defines "public crossing," OCR determined that the Aurora Street crossing was not a public crossing.

¶19 OCR also noted, notwithstanding the City's redevelopment plan or zoning powers, that the record does not contain any title report or recorded easement reflecting that the City retained a pedestrian access easement when it sold the land to private landowners. OCR further observed that the Easement did not re-establish a public way because the Owners retain rights for themselves and their tenants that are superior to the public's right to travel on the footpaths and can be terminated at any time. OCR also rejected the City's public dedication theory.

¶20 The City petitioned for judicial review. On review, the circuit court reversed OCR's determination, rejecting its reliance on a series of federal definitions. Instead, the circuit court considered the definition of "public highway" in the context of Wisconsin statutes and case law. The court concluded, contrary to OCR, that the Easement established a public highway and found that the Easement's use restrictions were consistent with the City's park policy, calculated for the public benefit, and generally preserved public access. The court also determined that the Easement was permanent and that, despite the termination clause, it had not actually been terminated. The court thus concluded that the Easement's limitations did not diminish the public nature of the walkways so that they remained public highways, and therefore, the crossing public. The circuit court did not address the City's other arguments.

¶21    OCR appeals.

## DISCUSSION

¶22    On appeal, we review the decision of the agency and not the circuit court. *Citation Partners, LLC v. DOR*, 2023 WI 16, ¶8, 406 Wis. 2d 36, 985 N.W.2d 761. Our scope of review is the same as that of the circuit court under WIS. STAT. § 227.57, and we shall set aside, modify, or remand the agency action if we determine that the agency erroneously interpreted a provision of law and a correct interpretation compels a particular action. *Tetra Tech EC, Inc. v. DOR*, 2018 WI 75, ¶11, 382 Wis. 2d 496, 914 N.W.2d 21; *Town of Holland v. PSC*, 2018 WI App 38, ¶21, 382 Wis. 2d 799, 913 N.W.2d 914.

¶23    We review the agency's legal conclusions de novo but defer to its findings of fact, so long as they are supported by substantial evidence. *Citation Partners*, 406 Wis. 2d 36, ¶8. To the extent we must consider and interpret statutes to resolve this appeal, our review is de novo, without deference to the agency's decision. WIS. STAT. § 227.57(11); *Tetra Tech*, 382 Wis. 2d 496, ¶3. However, we give "due weight" to the experience, technical competence, and specialized knowledge of an administrative agency as we consider its arguments. *Id.*; *see also* WIS. STAT. § 227.57(10).

¶24    Under WIS. STAT. §§ 195.28(1) and 195.29(1), OCR has the statutory authority to regulate certain railroad grade and highway crossings and require certain improvements or specific safety measures in the interest of public safety, but that authority does not extend to *private* railroad crossings. Here, we review OCR's conclusion that the Aurora Street pedestrian railroad crossing is

9

private, and therefore, outside of OCR's regulatory authority pursuant to §§ 195.28 and 195.29.[3]

¶25 WISCONSIN STAT. § 195.28 grants OCR the authority "to determine whether a public highway and railroad grade crossing protects and promotes public safety," and to order safety measures accordingly for that public highway and railroad grade crossing. WISCONSIN STAT. § 195.29 grants OCR authority to regulate a crossing in a location where a proposed "highway or street" is to be laid out across a railroad, or where railroad tracks cross or are crossed by "a street or highway." The crossing must therefore be "public" and must be crossed by a "highway or street." Secs. 195.28(1), 195.29(1).

¶26 A crossing is public when railroad tracks cross a public highway, way, or street. As a result, this case turns on whether the pedestrian footpaths created by the Easement are a "public way" or "public highway."[4] Although the statutes do not define "public way" or "public highway," the terms suggest that a two-part definition must be met for OCR to exercise its authority under WIS.

---

[3] Following OCR's determination that the crossing was private, the railroad temporarily closed the crossing, limiting the public's ability to circulate throughout the development.

[4] In the agency's opinion, OCR relied on references to a variety of federal regulations and state statutes unrelated to WIS. STAT. §§ 195.28 and 195.29. On appeal, OCR abandons references to federal law except 49 C.F.R. § 234.401, which it claims supports its analysis and is consistent with §§ 195.28 and 195.29. That regulation reads:

> *Public crossing* means a highway-rail or pathway crossing where the approaches are under the jurisdiction of and maintained by a public authority and open to public travel. All approaches must be under the jurisdiction of the public authority and no approach may be on private property, unless State law or regulation provides otherwise.

49 C.F.R. § 234.401.

STAT. §§ 195.28(1) and 195.29(1). There must be a street, way, or highway that crosses railroad tracks, and the street, way, or highway must be public.

¶27 The parties do not dispute, and we agree, that the terms street, public way, and public highway, are not limited to roadways or surfaces for vehicle traffic for purposes of WIS. STAT. §§ 195.28(1) and 195.29(1).[5] Therefore, a trail or path—including the Aurora Street crossing footpaths—may sufficiently satisfy the "way" or "highway" requirement.

### I. The Easement's unilateral termination clause makes it too indefinite to be a "highway" for purposes of WIS. STAT. §§ 195.28 and 195.29.

¶28 The parties rely largely on two of the same cases to define "public."[6] First, in *State ex rel. Happel v. Schmidt*, 252 Wis. 82, 86, 30 N.W.2d 220 (1947), our supreme court held that, generally, a public highway is a "way open to the public at large, for travel or transportation, without distinction, discrimination, or restriction except such as [is] incident to regulations calculated to secure to the general public the largest practical benefit therefrom and enjoyment thereof." The essentials of a public highway "are the right of common enjoyment on the one

---

[5] OCR concedes that it does have jurisdiction over some crossings on private land that the public may access via easements, licenses, or similar grants. Additionally, in a 2013 docket in another matter, OCR noted that, "In over 50 dockets since 1994, the OCR has consistently interpreted its jurisdiction over crossings of 'highways' to include public pathway crossings, provided that the pathway meets legal requirements to be considered a public highway," and that "highway" is not determined by the mode of transportation. *In the Matter of the: Petition of the Vill. of Mazomanie for the Establishment of a Pub. Crossing of the Wis. & S. R.R. Co. Tracks with the Wolf Run Trail in the Vill. of Mazomanie, Dane Cnty.*, No. 9170-RX-279, 2013 WL 653723, at *2 (Feb. 19, 2013).

[6] Both parties also cited *Weiss v. Chicago, N. Shore & Milwaukee R.R.*, 9 Wis. 2d 581, 101 N.W.2d 688 (1960), but *Weiss* did not decide whether the crossing in that case was public or private. The crossing in *Weiss* was a "farm crossing," situated upon private land and for the sole purpose of accommodating the occupants of such land. *Id.* at 590.

hand, and the duty of public maintenance on the other." *Id.* An easement or license for public use of otherwise private land *may* constitute a public highway or way if the easement or license is given by a private landowner to a public authority for the purpose of public access, provided it is open without "distinction, discrimination, or restriction" except as incident to regulations that serve the public's interest. *See id.*

¶29 In the other case, we considered whether a snowmobile trail could be considered a "highway" and therefore a public way for purposes of a public crossing under WIS. STAT. § 195.29(1). *Green Bay & W. R.R. Co. v. Transportation Comm'n of Wis.*, 123 Wis. 2d 147, 148, 365 N.W.2d 909 (Ct. App. 1985). While the factual background in *Green Bay* is limited, public snowmobile trails crossed private property pursuant to temporary, seasonal easements during the winter. *Id.* at 149. Within the private property through which the trails ran, the trails intersected a railroad track. *Id.* The Transportation Commission asserted that the crossings were public, but we disagreed. Noting the five-year term of the easement and seasonal nature of the public access rights to the crossing, we concluded that the seasonal and "transient nature of the public's right to use the trails" prevented the trails from being public ways. *Id.* We also observed in *Green Bay* that the landowner was not required to renew the easement at the end of the term. *Id.*

¶30 The City and OCR also discuss the significance of OCR decisions in *City of Mequon*[7] and *Village of Sturtevant*[8] which considered whether licenses

---

[7] *In the Matter of the: Petition of the Wisconsin Central Ltd. Tracks with the Mequon-Thiensville Bike Trail in the City of Mequon, Ozaukee County*, Docket No. 9164-RX-475.

granting public access to trails on private land sufficiently created a public way so that the trails' railroad crossings were public for purposes of WIS. STAT. §§ 195.28 and 195.29. OCR concluded that the licenses in those cases—written agreements that granted the public access to a bike trail on otherwise private property for a 15-year term—sufficiently made each trail a public way for purposes of finding that the railroad crossings were public, even though they need not be renewed after the expiration of the 15-year term. Accordingly, based on the facts in those cases, OCR declared the crossings public for the purposes of §§ 195.28(1) and 195.29(1).[9]

¶31 Within this legal framework, OCR argues that the Easement's restrictions limit public access in a manner that prevents the footpaths from being

---

[8] *In the Matter of the: Petition of the Wisconsin Department of Transportation for the establishment of a Public Crossing of the Union Pacific Railroad Co. Tracks with the Racine-Sturtevant Bike Trail in the Village of Sturtevant*, Racine County, Docket No. 9040-RX1183.

[9] The City argued that OCR's determination in this case is arbitrary and unreasonable in light of the revocable nature of the licenses. However, OCR explained in its reply brief that the City's argument misunderstood that the bike trail cases involved written licenses, which are written contracts for public access and could not be revoked during their initial term. *See Walterman v. Village of Norwalk*, 145 Wis. 663, 668, 130 N.W. 479 (1911) (holding that "[a] written license by one to another privileging the latter to use the former's land for some purpose, after having been acted upon by the former so that a subsequent loss would be inflicted upon him by its withdrawal, is irrevocable.").

The City asserts that both licenses had provisions allowing the unilateral revocation of the license by the licensor (i.e., the owner of the footpaths to the crossings), but that assertion mischaracterizes the provisions. For example, one provision allowed the licensor to maintain exclusive use of the licensed lands *so long as the bike trail was relocated*. The other provision allowed termination of the license in the event of a breach or violation of the license by the licensee if the breach is not corrected (or no substantial progress is made toward its correction) within 30 days of the licensee receiving notice of the breach. The Easement in this case contains no such guardrails on the termination of the Easement by the Owners. We therefore cannot say that OCR's decision is arbitrary, oppressive, or unreasonable, and reflects its will rather than its judgment based on its prior actions in these cases. *See Ottman v. Town of Primrose*, 2011 WI 18, ¶35, 332 Wis. 2d 3, 796 N.W.2d 411.

a public way. According to OCR, the footpaths' use and time restrictions violate *Happel*'s requirement that a "way [be] open to the public at large, for travel or transportation, without distinction, discrimination, or restriction except such as [is] incident to regulations calculated to secure to the general public the largest practical benefit therefrom and enjoyment thereof." *Happel*, 252 Wis. 82, 86. OCR additionally contends that the overnight closures make the footpaths of a "transient nature" like the seasonal snowmobile trails at issue in *Green Bay*. OCR points out that some of the restrictions give the Owners privileges not available to the general public, allow the Owners to limit or revoke public access, and note that the public is barred from using the footpaths during certain hours or when the City chooses not to clear snow from the paths. Finally, OCR notes that unlike the set 15-year term of the license agreements in the *Mequon* and *Sturtevant* cases, the Easement in this case is too indefinite because it is unilaterally revocable at the discretion of the Owners.

¶32 The City responds that the Easement—and therefore public access—has not been revoked and that, while the Easement does grant the Owners some additional rights, those rights are conditioned on the City's consent and maintaining alternate public access. The City also argues that the Easement's conditions are consistent with public access and use, exist for the public's benefit, and are consistent with the City's park regulations, which are designed to limit loitering and overnight access, to deter undesirable activities, and prevent nuisances, thereby ensuring continued public access by reducing the risk of revocation.

¶33 Although we agree with the City that the use restrictions do not prevent the footpaths from qualifying as a public way,[10] the Easement's revocability language does. The Easement exists in perpetuity, but the Owners may unilaterally revoke it by declaring a nuisance: the Easement exists forever unless and until it does not, at the discretion of the Owners. While we acknowledge and agree that the Easement has now existed longer than the five-year snowmobile easement in *Green Bay* and does not expire like the licenses in *Mequon* and *Sturtevant*, the revocability language makes the Easement too uncertain for any period. While the Easement could exist for 100 years, it could also be revoked tomorrow. Taken together, *Green Bay* and OCR's interpretation in the license cases all suggest that some minimum *guaranteed* term of public access—something more than five years—is required for the public's means of access over a railroad crossing to be considered a "public way."

---

[10] When we consider the principles in *Happel* and *Green Bay*, as well as the principles OCR has applied in the *Mequon* and *Sturtevant* license cases, we agree with the City that the majority of the Easement's use restrictions are limited and generally ensure the greatest public benefit for the purpose of preserving public access. The overnight closure restricts public access, but the closure is limited and serves the purpose of preventing certain activity in the public interest—much like restrictions that exist in parks or other public places—and, does not cause the footpaths to be less than public. Furthermore, although the Owners may use parts of the Easement for their own purposes, they may only do so temporarily, with the City's approval, and after providing an alternative public access route.

The Easement is not "transient' in the same way as the snowmobile easements at issue in *Green Bay*. The footpaths are a "way open to the public at large, for travel or transportation" and the use restrictions are best viewed as "regulations calculated to secure to the general public the largest practical benefit therefrom and enjoyment thereof," designed to further the public interest of public safety. Furthermore, the footpaths do not stop existing overnight in the same way snowmobile trails cease to exist outside of winter months. The footpaths exist for the sole purpose of conveying the public across the railroad tracks, and unlike the snowmobile trails easement, the crossing is not incidental to the other uses of an easement or license.

**II.    Neither the City's Zoning Powers nor Public Dedication Preserved Public Access to the Aurora Street Crossing because the Easement Established the Current Terms of Public Access.**

¶34    The City argues that even if the Easement does not establish a public way, the crossing is public based on alternative theories.  Specifically, the City contends that, as the result of its zoning decisions or public dedication, the footpaths were already public "highways" and therefore the crossing is public. The City points to OCR's 1981 determination and the recorded 1982 development plan which contained notations that there would be pedestrian access to the crossing, which carried through subsequent iterations of the City's development and implementation plans, as well as pedestrian use of the footpaths and crossing for decades.  OCR contends, however, that even if the City acquired access rights by zoning or other means, the Easement supersedes those rights, and therefore, whether the crossing is public is entirely dependent upon the Easement.

¶35    We agree with OCR.  Although the City contends that through its zoning authority and subsequent exercise of that authority, it maintained public pedestrian access to the railroad crossing "effectively retaining an easement for the public's benefit," the City subsequently entered into an *actual* easement with the Owners.  The Easement reflects a contractual alteration of rights and obligations, which the City agreed to, and the terms and conditions of the Easement now

control pedestrian access to the railroad crossing, regardless of whatever zoning restrictions the City previously imposed.[11]

¶36    For this same reason, the City's argument that a "public pedestrian right of way" was established on either side of the crossing under the theory of common law dedication fails.[12]    Even if we concluded—and we do not—that a public pedestrian right-of-way was established by common law dedication, the City contends that the Easement is valid.  This means that the City believes that the Owners retained sufficient rights to the property to agree to the Easement with the City.  When the City and Owners entered into the Easement, the Easement became the controlling document.   Because the Easement is the controlling document, the City's common law dedication argument must fail.

## CONCLUSION

¶37    We conclude that the crossing at issue in this case is not public, and therefore, OCR lacks jurisdiction over it.  The Easement granting public access to the crossing, being unilaterally revocable at any time by the Owners of the land upon which the footpaths to the crossing are situated, is too indefinite to be a

---

[11] We need not decide whether the City actually obtained rights through zoning authority, but note that the City lacks supporting legal authority for its claim that the public access and easement notations on City planning documents encumbered the land or "effectively" created an easement when easements are generally created by deeds, which we construe according to the intentions of the parties to the deed.  *See* ***Konneker v. Romano***, 2010 WI 65, ¶26, 326 Wis. 2d 268, 785 N.W.2d 432.

[12] The essential requisites of a valid common-law dedication are that there must be an intent to dedicate on the part of the owner and an acceptance of the dedication by the proper public authorities or by general public user. ***Galewski v. Noe***, 266 Wis. 7, 12, 62 N.W.2d 703 (1954).  Although we need not and do not decide if common law dedication occurred, *see* ***State v. Blalock***, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989), we question whether the existence of the Easement defeats any argument that dedication occurred because the City would not need the Easement if the crossing had been dedicated to the public.

public way for purposes of WIS. STAT. §§ 195.28(1) and 195.29(1). We further conclude that because the Easement established the current terms of public access to the crossing, neither the City's zoning powers nor public dedication support the City's assertion that the crossing is public.

*By the Court.*—Order reversed.

Not recommended for publication in the official reports.